JDG:PT
F.#2012R1637

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

  - against -

BRIAN LEE,

    Defendant.

- - - - - - - - - - - - - - - - - -X

**12M1031**

TO BE FILED UNDER SEAL

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF APPLICATION FOR ARREST
WARRANT

(T. 18, U.S.C.,
§§ 1001(a)(2),
1001(a)(3) and 2)

EASTERN DISTRICT OF NEW YORK, SS:

  EDWARD CHOO, being duly sworn, deposes and says that he is a Supervisory Investigator with the Office of the Inspector General, Port Authority of New York and New Jersey ("PA-IG"), duly appointed according to law and acting as such.

  Upon information and belief, in or about and between October 2011 and November 2011, within the Eastern District of New York and elsewhere, the defendant BRIAN LEE, together with others, did knowingly and willfully (a) make materially false, fictitious and fraudulent statements and representations, to wit: false claims that various individuals had received certain construction safety training, and (b) make and use false writings and documents, to wit: cards stating that the cardholder had received certain construction safety training, all in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: certification of completed

construction safety training by the Occupational Safety and Health Administration ("OSHA"), a division of the United States Department of Labor.

(Title 18, United States Code, Sections 1001(a)(2), 1001(a)(3) and 2)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been an Investigator for the PA-IG since 2001. The work of the PA-IG includes investigating fraud associated with construction projects performed for the Port Authority of New York and New Jersey and referring such frauds to federal authorities for prosecution. Prior to joining the PA-IG, I worked for 23 years in federal law enforcement, including five years as a special agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF") and 18 years as a special agent with the United States Customs Service ("U.S. Customs"), from which I retired in 2001 as a supervisory special agent. During my 23 years as a federal agent at ATF and U.S. Customs, I participated in an undercover capacity in numerous investigations and supervised many other agents acting in an undercover capacity. The facts set forth herein are based on my personal observations, including those made in an undercover capacity, information from confidential sources and witnesses, my discussions with other law enforcement officers and officials employed by the New York City

Department of Buildings ("DOB") and OSHA[1] and my review of documents and other evidence, including consensual recordings, as well as my experience and background as a criminal investigator.

2. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

I. The OSHA Safety Regime

3. At all times relevant to this complaint, in order for a construction worker to have been permitted to perform construction work on a "major building" in New York City, the DOB required that worker to possess a card from OSHA certifying that the worker had completed a 10-hour OSHA-designed class on

---

[1] OSHA is a division of the United States Department of Labor, within the executive branch of the United States government. OSHA's mandate includes, among other things, promulgating and enforcing rules and regulations pertaining to worksite health and safety.

construction site safety (an "OSHA-10 card"). If the DOB found workers without such cards, the DOB would remove those workers from the construction site or fine the workers. Workers could take the safety classes from instructors who were not employed by OSHA but who had been authorized by OSHA to teach such classes. These private instructors typically charged the workers who took the classes a fee.

4. Many construction sites in New York City were required by law, regulation or contractual agreement between the site owner and the contractor to have a site safety manager present when work was done at the site. Unless they were registered architects, licensed professional engineers, or had eight years of experience as a construction supervisor, applicants for the position of site safety manager in New York City were required to, among other things, take a 30-hour long OSHA-designed class on more advanced topics on construction site safety. Private OSHA-authorized instructors offered these classes as well, and individuals who completed these classes were entitled to possess cards ("OSHA-30 cards") showing that they had received this training.

5. After an OSHA-certified instructor gave a 10-hour or a 30-hour site safety class, the instructor sent OSHA's officially designated representative for the northeast region, the University of Medicine and Dentistry of New Jersey ("UMDNJ"),

the names of the individuals who successfully completed the class.[2] Sometime thereafter, UMDNJ mailed the instructor OSHA-10 cards and OSHA-30 cards for each of the individuals who completed the required classes with the name of the cardholder already printed on the card. The certification cards stated that use or distribution of the card for fraudulent purposes, "including false claims of having received training," may result in prosecution under Title 18, United States Code, Section 1001.

II. <u>The Defendant And The Defendant's Employer</u>

6. The defendant BRIAN LEE was employed by a business located in Queens, New York (the "Queens Business"). The Queens Business provided steel and other metal products for construction projects in the New York City area. LEE's father was the President of the Queens Business.

III. <u>The Scheme</u>

7. As a result of information provided by cooperating witnesses, in or about November 2010 the PA-IG began investigating an individual (hereinafter the "Middleman") who held himself out as a engineer, even though he was not educated or certified as an engineer. On or about July 5, 2011, the Middleman met with a cooperating witness (hereinafter "CW-1") who

---

[2] UMDNJ retains these names and the supporting documentation so they may be available for OSHA to audit at any time.

was equipped with a recording device.[2/]  The Middleman told CW-1 that the Middleman had a friend (hereinafter "Instructor #1") who would provide fraudulent OSHA certifications for a price of $300 per certification.[3/]  During a later recorded call, the Middleman identified Instructor #1 by name.  OSHA records show that Instructor #1 was authorized by OSHA to conduct construction training.

8.  On or about October 14, 2011, CW-1 informed me that the defendant BRIAN LEE had contacted CW-1 looking for Instructor #1's telephone number.  LEE told CW-1 that LEE needed the telephone number because he needed more OSHA cards.  On or about October 17, 2011, Instructor #1 told me during a recorded conversation that LEE had contacted Instructor #1, looking for three OSHA-10 cards.

---

[2/]  CW-1 co-owns a business in the construction testing field in the New York City area.  CW-1 has previously pleaded guilty in this district pursuant a cooperation agreement to violating 18 U.S.C. § 1349 in connection with CW-1's participation in construction testing fraud.  CW-1 is assisting the government's investigation in the hope of receiving leniency at sentencing.  CW-1's information has been corroborated by, among other things, consensually monitored recordings and undercover agents.

[3/]  The conversations captured in all recorded calls and meetings between the Middleman and CW-1 took place in the Hindi language.  CW-1, who is a native speaker of Hindi, and also a naturalized United States citizen and proficient in English, translated these conversations for me.  Accordingly, CW-1's translations of the recorded conversations between the Middleman and CW-1 are described herein.

9. On or about October 27, 2011, the defendant BRIAN LEE contacted CW-1, and they had an unrecorded conversation. CW-1 told LEE that CW-1 was going to see Instructor #1 and asked if LEE wanted CW-1 to pick up OSHA cards from Instructor #1, and how much each card cost. LEE told CW-1 that each card would cost $125.

10. On or about October 31, 2011, while equipped with a recording device CW-1 met with the defendant BRIAN LEE at the location of the Queens Business (the "Queens Business Location"). During this meeting, CW-1 asked LEE if he had ever received OSHA cards from Instructor #1 in the past without attending the necessary classroom instruction. LEE responded that he did not take the course and received OSHA cards anyway. LEE could not remember, however, if Instructor #1 was the instructor who was supposed to have taught LEE the classes. CW-1 asked LEE for the names of the people who needed OSHA cards, and LEE asked his secretary to write them down and give the list to CW-1, which the secretary did.

11. Instructor #1 died suddenly on or about November 2, 2011. On or about November 4, 2011, CW-1 engaged in a consensually recorded telephone call with the Middleman. CW-1 asked the Middleman if he had another contact, besides Instructor #1, who could provide fraudulent OSHA cards. The Middleman gave CW-1 the name and telephone number of another individual

(hereinafter "Instructor #2"). The Middleman also told CW-1 that the Middleman had one blank OSHA-30 card, which he would sell for $500. Later that day, CW-1 placed a recorded telephone call to Instructor #2 at the telephone number the Middleman had provided. CW-1 asked Instructor #2 if he would provide CW-1 with approximately eight OSHA-10 cards. Instructor #2 and CW-1 agreed that CW-1 would contact Instructor #2 again at a later date. On or about November 7, 2011, CW-1 engaged in another recorded telephone conversation with Instructor #2. During this call, they agreed that they would meet the next day.

12. On or about November 8, 2011 at approximately 11:44 a.m, while posing in an undercover capacity as CW-1's employee and equipped with a recording device, I accompanied CW-1 and another cooperating witness ("CW-2")[4] to a meeting with Instructor #2 in Queens. The meeting took place inside CW-1's automobile, parked outside a gas station. During the meeting, CW-1 placed a recorded cellular telephone call to the defendant BRIAN LEE. During the call, CW-1 handed the telephone to Instructor #2, and Instructor #2 made arrangements with the

---

[4] CW-2 co-owns CW-1's business. CW-2 has also previously pleaded guilty in this district pursuant a cooperation agreement to violating 18 U.S.C. § 1349 in connection with his participation in construction testing fraud. CW-2 is assisting the government's investigation in the hope of receiving leniency at sentencing. CW-2's information has been corroborated by, among other things, consensually monitored recordings and undercover agents.

defendant BRIAN LEE as to when and where Instructor #2 would perform the required training.

13. After finishing the telephone conversation, Instructor #2 told me, CW-1 and CW-2 that Instructor #2 could do the OSHA 10-hour course in about two or three hours. He further said that OSHA requires that the course span two different days, and that it would take about a month to a six weeks to obtain the ten requested OSHA-10 cards. Instructor #2 also said that in the past, Instructor #2 could have simply written out the cards from a stock he had on hand, but now he had to send in class sign-in sheets before OSHA would issue the cards. Instructor #2 said he charged $100 per OSHA-10 card and $450 per OSHA-30 card.

14. On November 14, 2011 at approximately 10:10 a.m., CW-1 informed me that Instructor #2 had contacted CW-1 to confirm that Instructor #2, CW-1 and I would be meeting the defendant BRIAN LEE at the Queens Business Location at 5:00 p.m. that afternoon. Instructor #2 also told CW-1 not to discuss with LEE the price that Instructor #2 was charging for OSHA-10 cards, because Instructor #2 was charging CW-1 $100 per card and charging LEE $125 per card. Later that day at approximately 4:55 p.m., while acting in an undercover capacity and equipped with a recording device, I entered The Queens Business Location. CW-1, whose employee I was posing as, accompanied me. While we waited

10

for Instructor #2, LEE told me that he had about five people to take the OSHA-10 class that Instructor #2 was supposed to give.

15. At approximately 5:24 p.m., Instructor #2 arrived at the Queens Business Location. I told Instructor #2 that one of the workers who was supposed to attend the class could not be present, and Instructor #2 agreed to include this person's name on the list of people who had attended the class anyway. Instructor #2 told me that I would need to put the missing person's name on the list with a telephone contact number and an address, but Instructor #2 also assured me that no one could contact the missing person. I overheard Instructor #2 talking with the defendant BRIAN LEE and LEE's secretary. They told Instructor #2 that they had employees who could not attend the class but whose names and contact information for those employees could be included on sign-in sheets. Instructor #2 told them that they could give him the contact information later if they did not have it with them.

16. In addition to myself, CW-1, Instructor #2 and the defendant BRIAN LEE, four other men were present at the Queens Business Location. Instructor #2 attached a computer to a projector and projected images concerning OSHA training topics so all in the room could see the images. The training, which is required to cover ten hours of instruction, lasted approximately twenty minutes. During this time, Instructor #2 required

everyone to print their names, telephone numbers and addresses on a roster sheet, and then print their names and sign in on two sign-on sheets, which were dated November 14, 2011 and November 15, 2011, respectively. At the end of the "class," I observed LEE make out a check to Instructor #2 for $625, for five OSHA-10 cards and give the check to Instructor #2. I also observed CW-1 make out a check for $300 to Instructor #2 for three OSHA-10 cards (one card for CW-1, one card for myself and one card for the fictitious person that CW-1 told Instructor #2 could not attend the class that evening), and give the check to Instructor #2. Instructor #2 then said he would mail in the request for OSHA-10 cards the next day, and that he could deliver the cards to us when he received them.

 17. On November 30, 2011, while acting in an undercover capacity and equipped with a recording device, I met Instructor #2 at a location in Queens. Instructor #2 gave me the three OSHA-10 cards for which CW-1 had previously paid Instructor #2. I offered to deliver the other five OSHA-10 cards to the defendant BRIAN LEE, but Instructor #2 said he would deliver them himself. The OSHA-10 cards Instructor #2 gave me did not have Instructor #2's name printed on them as the "trainer"; rather, the name of another OSHA-certified trainer, who was not present at the Queens Business Location (the "Missing Instructor") was

printed on them.[5] Later that day, while acting in an undercover capacity I went with CW-1 to the Queens Business Location. We asked to see LEE, but a female employee (the "FE") told us that he was not available. Visible in plain view on the FE's desk were OSHA-10 cards for four individuals. The Missing Instructor's name was printed on these cards as well. During a later visit to the Queens Business Location, the FE told me that workers employed by LEE needed OSHA-10 cards for a particular job they were doing in Queens.

IV. Sealing

18. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your affiant respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

---

[5]   A check of OSHA records revealed that on or about June 17, 2010, OSHA suspended Instructor #2's certification to issue OSHA cards (prior to October 2011, OSHA-certified trainers could sign class-takers' names on blank OSHA-cards and issue them to the class-takers). This suspension was due to OSHA's determination that an OSHA card issued to Instructor #2 in October 2009 was later found with another instructor's name written on it (in 2009, OSHA issued blank cards to instructors at the instructor's request, and the instructor was required to write his or her own name and the name of the cardholder on the card before issuing it).

13

WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of the defendant BRIAN LEE so that he may be dealt with according to law.

*Edward J Choo*
EDWARD CHOO
Supervisory Investigator
Office of Inspector General
Port Authority of NY & NJ

Sworn to before me this
14th day of November, 2012

THE HON    s/Reyes
UNITED ST                    E
EASTERN D